Case 2:25-cv-14047-DMM Document 127-8 Entered on FLSD Docket 10/06/2025 Page 1 of 7
Scott Rupp, Confidential Attorneys Eyes Only
September 09, 2025                                                1

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 2:25-cv-14047-DMM

GEM Products, LLC,

       Plaintiff,

-vs-

Rupp Marine, Inc.,

       Defendant.
_____



VIDEOTAPED DEPOSITION OF SCOTT RUPP

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Tuesday, September 9, 2025
9:11 - 4:47 p.m.

525 Okeechobee Boulevard
Suite 900
West Palm Beach, Florida 33401

Reported By:
Wendy Beath Anderson, RDR, CRR, CRC
Notary Public, State of Florida
Job #6957900-001

Page 2

```
 1  APPEARANCES:
 2
 3  On behalf of the Plaintiff:
 4       CHARLES PFISTER, ESQUIRE
         TAFT STETTINIUS & HOLLISTER LLP
 5       40 North Main Street, Suite 1700
         Dayton, Ohio 45423
 6       cpfister@taftlaw.com
 7  and
 8       GREGORY S. WEISS, ESQUIRE
         TAFT STETTINIUS & HOLLISTER LLP
 9       525 Okeechobee Boulevard, Suite 900
         West Palm Beach, Florida 33401
10       gweiss@taftlaw.com
11
12  On behalf of the Defendant:
13       ANDREW D. LOCKTON, ESQUIRE
         EDWARD F. MCHALE, ESQUIRE
14       MCHALE & SLAVIN, P.A.
         2855 PGA Boulevard
15       Palm Beach Gardens, Florida 33410
         alockton@mchaleslavin.com
16       emchale@mchaleslavin.com
17
18  ALSO PRESENT:
19       RON KARPANTY
20       ROBERT DOYLE - VIDEOGRAPHER
21
22
23
24
25
```

Page 3

```
                      - - -
                    I N D E X
                      - - -

WITNESS:            DIRECT   CROSS   REDIRECT   RECROSS

SCOTT RUPP

BY MR. PFISTER:        7
```

Page 4

```
                     - - -
                  E X H I B I T S
                     - - -

PLAINTIFF'S         DESCRIPTION                    PAGE
EXHIBIT 1           RUPP 3378 THROUGH 3385,         13
                    RUPP PRODUCT PHOTOS

EXHIBIT 2           GEM 0003802 TO GEM 0003805      25
                    RUPP PULLY PHOTOS
EXHIBIT 3           PHOTOGRAPH                      26
EXHIBIT 4           WEBSITE INFO SHEET FROM         28
                    MELTON INTERNATIONAL
                    TACKLE
EXHIBIT 5           WEBSITE INFO SHEET FROM         29
                    TACKLE DIRECT

EXHIBIT 6           WEBSITE INFO SHEET FROM         31
                    WHITEWATER OUTFITTERS
EXHIBIT 7           PHOTOGRAPH                      41
EXHIBIT 8           PHOTOGRAPH                      43
EXHIBIT 9           PHOTOGRAPHS                     49
EXHIBIT 10          ENLARGED VIEW OF RUPP           89
                    PULLEY

EXHIBIT 11          RUPP CATALOG                    98

EXHIBIT 12          CAD DRAWING OF RUPP            115
                    CLAMP-ON ROLLER ASSEMBLY
EXHIBIT 13          RUPP PULLEY CLUSTER            121
EXHIBIT 14          RUPP PULLEY CLUSTER            121
EXHIBIT 15          RIGGING INSTRUCTION MANUEL     157
EXHIBIT 16          PHOTOGRAPH                     188
```

Page 5

```
PLAINTIFF'S         DESCRIPTION                    PAGE
EXHIBIT 17          PHOTOGRAPH                     190
EXHIBIT 18          PHOTOGRAPH                     192
EXHIBIT 19          INSTAGRAM POSTED PHOTOS        204
EXHIBIT 20          INSTAGRAM PHOTOGRAPH           205
EXHIBIT 21          INSTAGRAM PHOTOGRAPH           210
EXHIBIT 22          PHOTOGRAPHS                    213
EXHIBIT 23          INSTAGRAM POST                 219
EXHIBIT 24          PHOTOGRAPH                     223
EXHIBIT 25          INSTAGRAM POSTED              226
                    PHOTOGRAPHS

EXHIBIT 26          PHOTOGRAPH                     228

EXHIBIT 27          PURCHASE ORDERS                241

EXHIBIT 28          E-MAILS AND PATENT             258
                    DOCUMENTS
EXHIBIT 29          E-MAILS AND CORRESPONDENCE    307
```

Page 146
1    Q.   Do you happen to know whether there were any
2  drawings that were sent to any manufacturing parties
3  within the last five years?
4    A.   I would -- I don't know about that.
5    Q.   Why not?
6    A.   I just -- I don't have a hands-on approach
7  or -- to our purchasing as I once did 20 years ago.
8    Q.   Have there been changes to this product
9  over -- within the last five years that would have
10 necessitated new drawings?
11   A.   Just those screws.
12   Q.   Would you have sent new drawings to anyone --
13   A.   No.  For the screws?  No, that's -- like I
14 said, that's an off-the-shelf item.
15   Q.   A little while ago it seemed to me that you
16 testified that you knew specifically that you had sent
17 drawings, not this specific drawing, but drawings
18 related to the housing to a company called Richland?
19   A.   Right.
20   Q.   Do you happen to know, yes or no, whether Rupp
21 still possesses that?
22   A.   Would we have sent them recently?
23   Q.   I'm asking whether you --
24   A.   No, we would not have.
25   Q.   I'm asking whether you know if you still

Page 147
1  possess them today?
2    A.   If they're hand drawings, I can't say.
3    Q.   And if they're computer drawings?
4    A.   They'd be buried in there somewhere.  I would
5  have to assume they are.
6    Q.   Okay.  What about with respect to these Rupp
7  carbon fiber pulley upgrades?
8    A.   Right.
9    Q.   Do you happen to know whether this product has
10 gone through any iterations --
11   A.   No.
12   Q.   -- different than what is depicted here?
13   A.   It's no -- no changes to that.
14   Q.   Who was on the conceptualization team for this
15 product?
16        MR. LOCKTON:  Object to form.
17        THE WITNESS:  Several people.
18 BY MR. PFISTER:
19   Q.   Who?
20   A.   Well, myself, a couple of CAD designers were
21 working with us.  Ron had a hand in that too.
22   Q.   Are these types of drawings that are shown on
23 Rupp 2406 and Rupp 2403, are these considered CAD
24 drawings?
25   A.   Yeah, I would call them that.

Page 148
1    Q.   Are you familiar with what CAD is as a
2  computer program?
3    A.   Computer -- yeah, I know the program we use,
4  Computer Assisted Design, or whatever it's called.
5    Q.   Do you happen to know whether in the CAD
6  application on your computer the drawings that you have
7  resemble the drawings that are shown here on these, Rupp
8  2403 and Rupp 2406?
9    A.   Yes, those would probably -- I mean, unless
10 somebody deleted them, they would be there somewhere.
11   Q.   Okay.  Do you -- or do you provide to your
12 third-party manufacturing partners, do the drawings that
13 you provide them have measurements and specifications
14 for the products?
15        MR. LOCKTON:  Object to form.
16        THE WITNESS:  Of course.  I mean, they've got
17   to have a guideline on how to make them.
18 BY MR. PFISTER:
19   Q.   If you wouldn't mind, sir, pulling up
20 Rupp 2403, which I don't remember which exhibit.  I
21 think that's ten.
22   A.   Right up top here, okay.
23   Q.   Could you tell me whether you see on that
24 document measurements for the products or for the parts?
25   A.   No.

Page 149
1    Q.   There are no measurements of any kind --
2    A.   I don't see any.
3    Q.   If you flip to the next page, Rupp 2404.
4    A.   Yes.
5    Q.   Could you tell me whether there are any
6  measurements on this document?
7    A.   I don't see any.
8    Q.   But you stated that you would have had to have
9  sent drawings with measurements to your third-party
10 manufacturing partners?
11        MR. LOCKTON:  Object to form.
12        THE WITNESS:  Well, sure, at some point in
13   time.
14 BY MR. PFISTER:
15   Q.   Do you happen to know whether you still have
16 those drawings with measurements?
17   A.   I do not know for sure.  Some of these are
18 older parts.  If they were older, they would have been
19 hand-drawn.  If that's the case, I don't -- I couldn't
20 lay my hands on them.  I can't say for sure.  Some of
21 these could be a CAD.
22   Q.   What about for parts that you would consider
23 newer parts?
24   A.   Newer parts we would have probably a -- yes,
25 there would be a drawing for it.

Page 174

1   A.   I see one.
2   Q.   What about Rupp 000 --
3   A.   Are we going to talk a little more about that
4   one?
5   Q.   No, we're moving on.
6   A.   Why?  I would like to.  This guy could have
7   more than one, I mean, but I guess he chooses not to.
8   Why isn't he?  He's not taking full advantage of his
9   outrigger.  He should have at least one more on each of
10  these, so...
11  Q.   Would you say that the outrigging
12  configuration --
13  A.   Again, I'm not a professional fisherman.  I
14  don't do it for a living.
15  Q.   Based on what you just said, would you say
16  that this rigging configuration is suboptimal?
17       MR. LOCKTON:  Object to form.
18       THE WITNESS:  Yeah, that's according to whose
19  opinion?
20  BY MR. PFISTER:
21  Q.   Yours.
22  A.   Not mine.  To me that would be perfect.  I
23  don't -- if I fish, it's probably -- you know, my boat
24  by myself, that would be ideal.
25  Q.   I just asked because of the pejorative

Page 175

1   testimony you just gave.  I just wasn't sure whether or
2   not you believed it to be suboptimal or not.
3        Let's move on to Rupp 000034.  Could you tell
4   me on outrigger --
5   A.   Did we skip 33?
6   Q.   We did.
7   A.   All right.
8   Q.   Trying to be expeditious here.
9        In terms of 000034, could you tell me how many
10  halyard lines you see on each outrigger pole?
11  A.   Okay.  On there it looks like they're using
12  three.  They should be color-coded.  They're all the
13  same if it's a halyard line.  Just for, you know,
14  drawing perspective.
15       Okay.  So what do you say?  There's three, I
16  guess so.
17  Q.   Is there anything attached to those three
18  outrigger -- or excuse me, halyard lines on each
19  outrigger?
20  A.   Yeah, it looks like you got two outrigger
21  clips to each rigger, halyard lock, stainless ring with
22  a teaser, two hooks on each outrigger, capable of
23  catching a fish.
24  Q.   Is -- when you referenced stainless ring and
25  two outrigger clips, are those connected respectively to

Page 176

1   one halyard line?
2        MR. LOCKTON:  Object to form.
3        THE WITNESS:  It could be via this drawing.
4   However, you could add multiple to one line.
5   BY MR. PFISTER:
6   Q.   Does this drawing show one connected to each
7   halyard line?
8   A.   By -- it looks like there is.
9   Q.   All right.  Okay.  Thank you.
10       MR. PFISTER:  Lunch?
11       MR. LOCKTON:  That will work.
12       THE WITNESS:  Good idea.
13       THE VIDEOGRAPHER:  We're off the record.
14       (A break was had.)
15       THE VIDEOGRAPHER:  We're back on the record.
16  BY MR. PFISTER:
17  Q.   Okay.  Mr. Karpanty -- excuse me.  Mr. Rupp,
18  thank you for this morning.  Hopefully, we can get
19  through the afternoon smoothly.  I wanted to go back to
20  something we were talking about earlier, which was some
21  drawings, some CAD drawings, as you referred to them,
22  involving the Rupp pulleys.
23       How many people did you say work in your
24  drawing department?
25  A.   I would say two, three.

Page 177

1   Q.   Who are those people?
2   A.   It would be myself, Joe.
3   Q.   Joe who?
4   A.   Joe Hardy.
5   Q.   And who else?
6   A.   That's probably it.  Now, there's some
7   deceased people that were handling a lot of our stuff.
8   Q.   And so you and Mr. Hardy, what do you do in
9   the drawing department?
10  A.   Him more so than I, like I said, when we were
11  drawing back in the day, when it was drafting on a
12  table, I did myself and my father all of it.  When it
13  came to 3D modeling a CAD system, I don't know much
14  about it.  That's why I don't participate in that fully.
15  Q.   Do you participate --
16  A.   I can access things, but the file management
17  is a little bit out of my scope.
18  Q.   Whose scope is the file management within?
19  A.   It would be probably Joe.
20  Q.   Does he have a written policy regarding file
21  management for his design drawings?
22  A.   No.
23  Q.   Does Mr. Hardly regularly, to your knowledge,
24  catalog drawings based by product?
25  A.   That I don't know.

Page 178

1   Q.  Do you happen to know how frequently Mr. Hardy
2   or yourself make drawings for products?
3       A.  I cannot say.  I don't have him working on
4   anything specific at the moment.
5       Q.  Do you ordinarily instruct Mr. Hardy or do you
6   yourself make drawings for any new product that Rupp
7   Marine launches?
8           MR. LOCKTON:  Object to form.
9           THE WITNESS:  I don't.  No, I do not.
10  BY MR. PFISTER:
11      Q.  Does Mr. Hardy?
12          MR. LOCKTON:  Object to form.
13          THE WITNESS:  Typically he would.  We have no
14      projects currently in design.
15  BY MR. PFISTER:
16      Q.  Is Mr. Hardy instructed to save all of the
17  drafts and all of the --
18      A.  Nothing --
19          MR. LOCKTON:  Object to form.
20          THE WITNESS:  -- in writing.
21          MR. LOCKTON:  Object to form.
22          THE WITNESS:  He kind of freelances over there
23      to some degree.  Sometimes it's hard to keep him
24      busy.
25

Page 179

1   BY MR. PFISTER:
2       Q.  Did you happen to work with Mr. Hardy during
3   the document collection phase of this case?
4       A.  I think I sent him in notes; yeah.
5       Q.  What kind of notes?
6       A.  He'd come in late, I'd leave a note on his
7   desk.
8       Q.  What would it say?
9       A.  Oh, looking for this, that.  Nothing specific.
10      Q.  Can you give me an example?
11          MR. LOCKTON:  Object to form.
12          THE WITNESS:  I can't.  Nothing specific, I
13      can't.
14  BY MR. PFISTER:
15      Q.  You don't recall any specific instructions
16  that you gave to him?
17      A.  Not at the moment.
18      Q.  Do you happen to know whether anybody else
19  participated in the document collection process?
20      A.  Not that I'm aware of.
21      Q.  So the only two people that participated in
22  the document collection process were you and Mr. Hardy?
23          MR. LOCKTON:  Object to form.
24          THE WITNESS:  It depends what document it is,
25      what type of document.

Page 180

1   BY MR. PFISTER:
2       Q.  Provide me an example.
3       A.  No, you need to tell me what type of document.
4   I mean, that's -- like invoices and such like that, I
5   have -- I had no participation in that whatsoever.
6       Q.  My question was, did you and Mr. Hardy
7   participate exclusively in the document collection
8   process?
9           MR. LOCKTON:  Object to form.
10          THE WITNESS:  No.
11  BY MR. PFISTER:
12      Q.  Who else participated in that process?
13      A.  Well, Ron collected some documents as well.
14      Q.  Do you happen to know whether -- and by Ron,
15  are you referring to Mr. Karpanty?
16      A.  Yes.
17      Q.  Do you happen to know whether Mr. Karpanty
18  collected any drawings for Rupp's pulley products?
19      A.  Those I would say probably not.  I don't know
20  if he had any communication with Joe regarding documents
21  or requested documents.  I don't know.
22      Q.  So with respect to design documents, that was
23  exclusively you and Mr. Hardy?
24          MR. LOCKTON:  Object to form.
25          THE WITNESS:  If -- yeah, if they were

Page 181

1   available in CAD form, then he would have produced
2   them.
3   BY MR. PFISTER:
4       Q.  Did you instruct Mr. Hardy to produce all
5   relevant CAD design drawing documents?
6           MR. LOCKTON:  Object to form.
7           THE WITNESS:  That I was aware of.
8   BY MR. PFISTER:
9       Q.  So if you were unaware of a document --
10      A.  -- then it would not have probably been
11  retrieved.
12      Q.  What about in an instance where a document
13  exists but you were unaware of it, would that document
14  have been subject to the collection policies?
15          MR. LOCKTON:  Object to form.
16          THE WITNESS:  I'm not sure.  If I was not
17      aware of it, I don't know where it would be.
18  BY MR. PFISTER:
19      Q.  So you're saying that you're aware of the
20  location of all design drawings at Rupp?
21          MR. LOCKTON:  Object to form.
22          THE WITNESS:  No, I'm saying I don't know
23      where they are.  Obviously, there were some that we
24      still have that are relevant.  If they weren't
25      produced ten years ago, then they might probably --

Page 182

1  they would probably be in the CAD file.
2  BY MR. PFISTER:
3      Q.  I'm sorry.  You said "if they weren't produced
4  ten years ago."  What do you mean by that?
5      A.  Well, if they're an older drawing, as I
6  mentioned, we used to do things by hand and if those --
7  the old drawings, I can't guarantee that there are
8  any -- or there might be some available.  There may not
9  be all of them.  I don't know.
10     Q.  A moment ago you said that the documents that
11 were produced are the ones that you're aware of.  Is
12 that what you said?
13         MR. LOCKTON:  Object to form.
14         THE WITNESS:  I don't recall what I said.
15 BY MR. PFISTER:
16     Q.  Okay.  So was the instruction -- let me ask it
17 a different way.
18         Did you collect or did you instruct Mr. Hardy
19 to collect all responsive documents?
20         MR. LOCKTON:  Object to form.
21         THE WITNESS:  I gave him direction for some
22     and what I guess I -- at the time I thought was
23     relevant.
24 BY MR. PFISTER:
25     Q.  So you provided Mr. Hardy an instruction to

Page 183

1  collect relevant design documents; is that correct?
2          MR. LOCKTON:  Object to form.
3          THE WITNESS:  Yes.
4  BY MR. PFISTER:
5      Q.  Did you instruct Mr. Hardy to make his own
6  determination on what he believed was relevant?
7          MR. LOCKTON:  Object to form.
8          THE WITNESS:  Probably would be to some
9      degree, yes.
10 BY MR. PFISTER:
11     Q.  Do you happen to know whether Mr. Hardy
12 produced any documents directly to your attorneys in
13 this case?
14     A.  That I do not know.
15     Q.  And I believe earlier you testified that you
16 produced some documents to your attorneys in this case?
17     A.  I did.
18     Q.  Did Rupp utilize the services of a third-party
19 document collection vendor?
20         MR. LOCKTON:  Object to form.
21         THE WITNESS:  No.
22 BY MR. PFISTER:
23     Q.  Do you happen to know offhand what Mr. Hardy's
24 e-mail address is?
25     A.  Not offhand I don't.

Page 184

1      Q.  Do you happen to know offhand how long
2  Mr. Hardy's been employed by Rupp Marine?
3      A.  I'm going to guess it's been six years, maybe
4  five.
5      Q.  And has his role been consistent the whole
6  time he's been there?
7      A.  For a period of time he worked as an employee,
8  assembled production.  He was involved.
9      Q.  Did you have someone preparing design drawings
10 prior to Mr. Hardy's tenure at Rupp Marine?
11     A.  Yes.
12     Q.  Who?
13     A.  The gentleman that passed.
14     Q.  Did that gentleman prepare any CAD drawings?
15     A.  For I, yeah, possibly.
16     Q.  Has Rupp Marine utilized the same computer
17 system since 2015?
18         MR. LOCKTON:  Object to form.
19         THE WITNESS:  That I'm not sure of.
20 BY MR. PFISTER:
21     Q.  Let me ask a different way.  Is it possible
22 for Rupp to have stored on its computer files that date
23 back to 2015?
24     A.  That I'm not sure of.
25     Q.  You don't know or --

Page 185

1      A.  I don't know.
2      Q.  Okay.  When you provided all of the documents
3  to your attorneys, did you state these are all the
4  documents we have in our possession?
5          MR. LOCKTON:  Object to form.  Don't answer.
6      Privileged information.  If you can answer
7      without --
8  BY MR. PFISTER:
9      Q.  Right, right.  They're absolutely correct.
10 Don't tell me anything they said to you.  Don't tell me
11 anything they communicated in terms of what you should
12 or shouldn't do.  I simply want to know what you stated.
13         MR. LOCKTON:  Yeah, don't answer that.
14         MR. PFISTER:  He can answer what he said.
15         MR. LOCKTON:  No.  You don't have to answer
16     that, and I'm instructing you not to answer that to
17     the extent you're telling us responsive information
18     for this case for the purpose of this case.
19         MR. PFISTER:  Okay.  So you're instructing the
20     witness not to answer the question of whether he
21     stated that he's produced all responsive documents;
22     is that correct?
23         MR. LOCKTON:  I'm instructing the witness not
24     to answer what he told us in the context of his
25     attorney-client privilege; yes.

Page 186
1     MR. PFISTER:  I would like to know if that's
2  specific to whether or not you're instructing the
3  witness to refrain from stating on that basis, that
4  he peruse all responsive documents.
5     MR. LOCKTON:  Don't answer any question about
6  what your communication was to us.
7     Yes, if you want to ask him a different
8  question that's not about communications, you're
9  more than welcome to.
10 BY MR. PFISTER:
11    Q.  Do you believe that you produced all
12 responsive documents that relate to design drawings in
13 this case?
14    A.  To my knowledge.
15    Q.  Do you believe that there is documents that
16 are housed on Rupp's system that pertain to design
17 drawings of the accused products, the pully clusters in
18 this case, that were not produced?
19    MR. LOCKTON:  Object to form.
20    THE WITNESS:  I do not know.
21 BY MR. PFISTER:
22    Q.  You don't know?
23    A.  I don't know.
24    Q.  Is it possible?
25    A.  I don't know.

Page 187
1     Q.  Do you happen to know offhand whether there
2  are documents saved on Rupp's computer system that are
3  different than the design drawings that we were looking
4  at previously?
5     MR. LOCKTON:  Object to form.
6     THE WITNESS:  I do not know.
7  BY MR. PFISTER:
8     Q.  Is it possible?
9     A.  I don't know.
10    Q.  Does Rupp utilize any 3D modeling?
11    MR. LOCKTON:  Object to form.
12    THE WITNESS:  I believe so.
13 BY MR. PFISTER:
14    Q.  Is that modeling part of a computer program?
15    A.  I believe so.
16    Q.  Is that computer program the same computer
17 program that generates the drawings that we were
18 referencing earlier?
19    A.  I don't know.
20    Q.  You don't know?
21    A.  No.
22    Q.  Does the -- do you know whether or not those
23 files that are part of that 3D modeling are saved to
24 Rupp's system?
25    A.  I would guess they are.

Page 188
1     Q.  Do you happen to know whether or not those 3D
2  model files are delivered to any of Rupp's third-party
3  manufacturing partners?
4     MR. LOCKTON:  Object to form.
5     THE WITNESS:  I do not know.
6  BY MR. PFISTER:
7     Q.  Is it possible?
8     A.  I don't know.
9     Q.  Have you ever delivered a 3D model file to a
10 manufacturing partner of Rupp Marine?
11    MR. LOCKTON:  Object to form.
12    THE WITNESS:  Me personally, no.
13 BY MR. PFISTER:
14    Q.  Has Tom Hardy, to your knowledge, ever
15 delivered a 3D manufacturing file to a third-party
16 manufacturer of Rupp Marine?
17    MR. LOCKTON:  Object to form.
18    THE WITNESS:  Possibly.
19 BY MR. PFISTER:
20    Q.  I am going to hand you Plaintiff's 16.  This
21 is Rupp 003399.
22       (Plaintiff's Exhibit No. 16 was marked for
23 ID.)
24 BY MR. PFISTER:
25    Q.  Mr. Rupp, can you tell me what you see in this

Page 189
1  photo?
2     MR. LOCKTON:  Object to form.
3     THE WITNESS:  It's a boat show display.
4  BY MR. PFISTER:
5     Q.  Are there any specifics about whose boat show
6  display you can identify?
7     A.  I clearly see our logo.
8     Q.  Do you happen to know if this was a boat show
9  that Rupp Marine was actually participating in?
10    MR. LOCKTON:  Object to form.
11    THE WITNESS:  I see our display.
12 BY MR. PFISTER:
13    Q.  So it's safe to say this is a Rupp Marine
14 display at a boat show?
15    A.  I would say it is.
16    Q.  Do you happen to know when this boat show took
17 place?
18    A.  Not at all.
19    Q.  You have no idea?
20    A.  No idea.
21    Q.  And there's nothing that's in the photograph
22 that may jog your memory?
23    A.  Nothing.
24    Q.  Okay.  So it's entirely possible that this
25 could have been last year's boat show?